TEBBETS et al. v. MERCANTILE CREDIT GUARANTEE CO. OF NEW YORK.

(Circuit Court of Appeals, Second Circuit. March 17, 1896.)

1. CONTRACTS—INTERPRETATION—CREDIT INSURANCE POLICY.

A contract by which a corporation, though called a "guarantee" or "surety" company, undertakes, in consideration of premiums paid, to indemnify the other party to such contract against losses by uncollectible debts, is not a contract of suretyship, but a policy of insurance, and, as such, subject to the rule that any ambiguities in the policy drawn up by the insurer, who makes his own conditions, are to be resolved against the draftsman.

2. CREDIT INSURANCE—INITIAL LOSS—INTERPRETATION OF POLICY.

The M. Guarantee Co. issued a policy of credit insurance to T. & Co., insuring them, in consideration of a premium paid, against losses in their business during the year 1893. The contract consisted of T. & Co.'s application, in which they stated the amount of their gross sales and deliveries for the preceding 14 months at $622,835, and their total losses during the same period at $1,323, and which contained certain "Special Terms and Conditions," and of the company's policy, in the opening clause of which the company agreed to purchase from T. & Co. an amount not exceeding $15,000 of uncollectible debts, arising during 1893, in excess of one-half of 1 per cent. of their total gross sales and deliveries, subject to the conditions below. There were 13 such conditions besides the "Special Terms" of the application, which were incorporated into the policy, and included a provision that "the contract is issued on the basis that the yearly sales and deliveries of the insured are between $1,800,000 and $2,500,000." *Held*, that the latter clause was not a stipulation that the total sales and deliveries, on which the one-half of 1 per cent. was to be computed, must amount to at least $1,800,000, but that T. & Co. were entitled to recover from the insurer their losses, not exceeding $15,000, in excess of one-half of 1 per cent. on their actual total of sales and deliveries during the year.

In Error to the Circuit Court of the United States for the Southern District of New York.

This case comes here on writ of error to review a judgment of the circuit court, Southern district of New York, in favor of defendant in error, who was defendant below. The action was brought on a policy of insurance against business losses or "uncollectible debts," issued by the defendant to the plaintiffs. The total amount of uncollectible debts for which it was claimed the defendant was liable under the policy, without deducting the "initial loss" to be borne by the plaintiffs, was $8,016.56, and they were adjusted by defendant

at that sum. The total gross sales and deliveries made by the plaintiffs during the period covered by the policy amounted to $778,015.08. Plaintiffs contended that the initial loss to be borne by them was one-half of 1 per cent. of that sum, which amounts to $3,890.07, and they asked judgment for the balance of loss, viz. $4,126.29. The defendant insisted that the initial loss, under the terms of the policy, was $9,000,—a sum greater than the total loss, as adjusted. The circuit court sustained defendant's contention, and directed a verdict in its favor.

Albert Stickney, for plaintiffs in error.

A. J. Dittenhoffer, for defendant in error.

Before PECKHAM, Circuit Justice, and LACOMBE and SHIP-MAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). One question only is presented under this writ of error, and it arises upon the construction of a written instrument. Insurance against mercantile losses is a new branch of the business of underwriting, and but few cases dealing with policies of that character have as yet found their way into the courts. The necessarily nice adjustments of the respective proportions of loss to be borne by insurer and insured, the somewhat intricate provisions which are required in order to make such business successful, and the lack of experience in formulating the stipulations to be entered into by both the parties to such a contract, have naturally tended to make the forms of policy crude and difficult of interpretation.

One of these policies, differing in many respects from the one under discussion in this case, was before this court in Guarantee Co. v. Wood, 15 C. C. A. 563, 68 Fed. 529. Of a clause ambiguous in its phraseology and contradictory of other paragraphs in the contract, the court said:

"As that contract is a voluminous document, prepared by the company, any ambiguity in its phraseology should be resolved against the draftsman. * * * If the particular clause requiring interpretation cannot be brought into harmony with the rest of the contract, and the instrument considered as a whole is ambiguous touching the precise loss which the policy covers, that meaning is to be given to it which is most favorable to the insured."

In Wallace v. Insurance Co., 41 Fed. 742, the United States circuit court for the district of Iowa expresses the same principle in this language:

"A contract drawn by one party, who makes his own conditions, will not be tolerated as a snare to the unwary; and if the words employed, of themselves, or in connection with other language used in the instrument, or in reference to the subject-matter to which they relate, are susceptible of the interpretation given them by the assured, although in fact intended otherwise by the insurer, the policy will be construed in favor of the assured."

In Wadsworth v. Tradesmen's Co., 132 N. Y. 540, 29 N. E. 1104, the court says:

"If this policy is so framed as to promise a payment of $4,000, and then to impair the promise by the introduction of subsequent and obscure clauses, difficult to be understood, or requiring expert knowledge for their comprehension, we should adopt that construction which we think the insurer had reason to suppose was understood by the insured."

In the light of the well-settled principle of law expressed in these authorities, the contract under consideration must be construed.

The cases cited by defendant in error holding that a surety is "a favorite of the law," and that a claim against him is strictissimi juris, have no application. Corporations entering into contracts like the one at bar may call themselves "guarantee" or "surety" companies, but their business is in all essential particulars that of insurers, who, upon careful calculation of the risks of such business, and with such restrictions of their liability as may seem to them sufficient to make it safe, undertake to assure persons against loss, in return for premiums sufficiently high to make such business commercially profitable. Their contracts are, in fact, policies of insurance, and should be treated as such.

The material parts of the contract under consideration are as follows. First comes the application of the assured:

"No. *2,008.*                                                    Amount, *$15,000.*

"The Mercantile Credit Guarantee Company of New York.

"Head Office, 291 Broadway, New York.

"Contract expires *Dec. 31, 1893.*
"Indemnified stands ½ of 1%.
"Fee, *$472.50.*

"The undersigned hereby applies to the Mercantile Credit Guarantee Company of N. Y. for a contract to purchase from him uncollectible accounts in the sum of fifteen thousand dollars, for one year from *Dec. 31, 1892,* in the usual form of contract issued by the company, and upon the terms and conditions therein specified, and for that purpose selects the Bradstreet Co. Mercantile Agency as his informant and guide, as designated in said contract, and states that he is engaged in the business of *cottons & woolens, at 72 Bedford St., Boston, Mass., and 75-77 Worth St., N. Y.,* and that the amount of his gross sales and deliveries of merchandise for cash and on credit, and the percentage of losses on the same, for the *14 months* preceding the *1st day of Dec.. 1892,* were, respectively, as follows:

Gross sales for year ending ...... day of............................ $
     "      losses not exceeding............................................ $
Gross sales for year ending ...... day of............................ $
     "      losses not exceeding............................................ $
Gross sales for year ending ...... day of............................ $
     "      losses not exceeding............................................ $

"Remarks.

"Cotton sales, Sept. 1/91, to Dec. 1/92, $662,835.65.
"Gross losses, Weis Bros., Galveston, Texas, $479.69.
     "       "      M. J. Henry, N. Y., $844.03.
"Goods sold 2%, 10 days and 30 days; special a/c, 4 months.
"This contract to cover all goods billed since Oct. 1/92, not provable under U. S. Credit System Co.'s contract No. 3,909, Series H, Class E. Have proved no excess on either cotton or woolen goods under the U. S. Credit System Co. contract in 1892. Our woolen sales in 1892 were small, and form no basis for an estimate of probable losses in 1893.
"Boston, Dec. 13, 1892.                          Tebbets, Harrison and Robins."

This application is a printed form. The parts italicized and all subsequent to the word "Remarks" were originally blank, and have been filled in with ink, presumably before the application was finally presented for action. On the reverse side of the application are a number of so-called "Special Terms and Conditions." In the record they cover 3½ printed pages. The first few lines are all that are material here. They read as follows:

"(Gum this margin to the contract.)

"Form No. 7. Special Terms and Conditions of Contract. No. *2,008.*

"(1) This contract is issued on the basis that the yearly sales and deliveries of the indemnified are between *$1,800,000 and $2,500,000* dollars, and shall only," etc.

The parts italicized were originally blank, and have been filled in with ink. The material parts of the policy itself are as follows:

"No. *2,008.*                                                    *$15,000.*

"The Mercantile Credit Guarantee Company, in consideration of the sum of *$472.50,* hereby agrees to purchase from *Tebbets, Harrison & Robins, of* * * *, an amount not exceeding *fifteen thousand* dollars of uncollectible debts owing for merchandise sold and delivered in the regular course of business between *Dec. 31, 1892,* at 12 o'clock noon, and *Dec. 31, 1893,* at 12 o'clock noon, on the total gross sales and deliveries made during said period in excess of one-half of one per cent., subject to the terms and conditions printed below and attached hereto."

The italicized parts were originally blank. Then follow, in the body of the policy, 13 terms and conditions and the execution clause. Upon a blank space left in the body of the contract is pasted an exact copy of the special terms and conditions of form No. 7, as above set forth.

The opening statement of what the consideration is, and of what the company agrees to do in return for such consideration, is awkwardly phrased, but, without resort to anything outside of the policy, expresses the following agreement: The company will buy of the assured—i. e. will pay to the assured—the amount of certain uncollectible debts. These uncollectible debts must be such as are owing for merchandise sold and delivered during the year 1893. The amount of such debts which the company will pay must be a part of the whole amount of debt arising on the total gross sales and deliveries made during the year. It must also be debt in excess of one-half of 1 per cent. on such total gross sales; and in no event will the company pay more than $15,000. In other words, of the total uncollectible debts arising on sales and deliveries during the year, the assured is first to bear an initial loss to the amount of one-half of 1 per cent. on his total sales and deliveries during the year; and the residue of uncollectible debts the company is to buy from the assured, up to the limit of $15,000. It is not disputed that this is precisely what the first clause of the contract provides, nor that, if it stood alone, such would be the obligation which the company assumed. Moreover, it is unambiguous. Crude and complicated though its phraseology is, it is susceptible of no other construction. It is, however, qualified by the words "subject to the terms and conditions printed below, and attached hereto." This clause imports into the contract both the 13 general terms and conditions printed in the body of the policy, and also the special terms and conditions of form 7, which are attached to it. The only question presented here is whether these terms and conditions, or any of them, so qualify the contract expressed in the opening sentence of the policy as to change the amount of the initial loss from one-half of one per cent. of the total gross sales during the year to some other sum.

The only clause which it is contended has this effect is the special condition above quoted, and which reads as follows:

"This contract is issued on the basis that the yearly sales and deliveries of the indemnified are between $1,800,000 and $2,500,000 dollars."

The defendant insists that this is a stipulation on the part of the insured that during the year 1893 his total gross sales and deliveries shall be, at least, $1,800,000, and that the one-half of 1 per cent. of initial loss shall be calculated at least on that sum. The plaintiffs insist that this is merely an estimate as to the amount of the plaintiffs' probable sales in the future, and supplies a basis for an estimate of plaintiffs' probable losses in the future. It will be noted that the form of application contains blanks manifestly intended to be filled with statements of the total sales and total losses for three years preceding the application. These, as plaintiffs contend, would furnish data from which to make an estimate of probable sales and losses for the ensuing year. These blanks are not filled in plaintiffs' application, possibly because the firm had not been in business for three years. A statement of their sales and losses in the cotton business for 14 months is given, with the addition that their woolen sales in 1892 were small, and form no basis for an estimate of probable loss in 1893.

In support of their respective contentions, counsel have presented arguments based on the grammatical structure of the special condition. On the one side, it is urged that the clause reads "on the basis that the yearly sales 'are' between," etc.; not "have been." On the other side, it is urged that the phrase beginning, "this contract is issued on the basis," etc., refers to the issuance or inception of the contract, rather than to its construction; that the word "yearly" carries the idea of a series of years; that the use of the word "are," instead of "shall be" or "are to be," imports a present expectation, not a future stipulation. Arguments based merely upon grammatical construction, however, are of little aid towards the interpretation of this contract. If its draftsman possessed any appreciation of grammatical niceties, he has left no trace of it apparent upon the face of the document. The special condition is so phrased that it is susceptible of interpretation either way; and there are difficulties about accepting either interpretation. If it be construed as a statement of what it was estimated would be the range of total sales for the year, it is manifestly an arbitrary estimate, greatly in excess of what the experience of the 14 prior months apparently warranted; and no good reason is suggested why any such mere "estimate" should be inserted in the body of the contract at all. The representations of the insured as to what his past sales and losses had been were already made a material part of the contract, by a general condition providing that "fraud, concealment, or misrepresentation in obtaining this contract  * * *  shall render this contract absolutely void." On the other hand, while it is manifest that, in order to make insurance business of this kind practicable, some definite initial loss must be borne by the insured, it nowhere appears that such initial loss may not with perfect safety be proportioned to the total gross sales, for, presumably, the gross losses would vary

as the gross sales. And, in fact, even on defendant's construction of the phrase, the initial loss is a variable quantity. The basis provided for is that the yearly sales are "between $1,800,000 and $2,-500,000." If they be $1,800,000, the initial loss would be $9,000. If they be $2,000,000, the initial loss would be $10,000. If they be $2,500,000, the initial loss would be $12,500. Moreover, if the clause be construed so as to import a stipulation that the business done shall not be less than $1,800,000, it must be construed as importing also a stipulation that the business done shall not exceed $2,500,000,—a most extraordinary agreement for any business man to enter into, and certainly one not to be read into this contract by any doubtful language. Under defendant's interpretation, if the initial loss is to be in no event, however small the sales, less than $9,000, the initial loss can in no event, however great the sales, exceed $12,500. The result would be that, although the sales should run up to $4,000,000, the insured would be required to bear an initial loss, not of $20,000 (one-half of 1 per cent. of the gross sales), but of $12,500 only, the same amount he would be required to bear if his sales were only $2,500,000, although the increase in total sales necessarily increased the total losses. It is hardly conceivable that an insurance company would enter into such a reckless stipulation, and no such meaning is to be given to the policy upon any doubtful language.

We have, then, in the contract, a positive and unambiguous agreement on the part of the company to pay losses (to the amount of $15,000) in excess of one-half of 1 per cent. on total sales. The only other sentence in the policy which it is claimed modifies this definite agreement is one which is itself ambiguous, equally susceptible of a construction favorable to the company and of one favorable to the insured. Under the rule laid down in the authorities above quoted, the ambiguous sentence is to be given the meaning which the insurer had reason to suppose the insured would attach to it; and that is such a meaning as would not operate to contradict or modify to his disadvantage the precise and unambiguous promise that the initial loss should be one-half of 1 per cent. of the total gross sales and deliveries for the year 1893, or, as expressed in the very beginning of the application, "Indemnified stands ½ of 1%."

The judgment of the circuit court is reversed, and new trial ordered.