MARYLAND CASUALTY COMPANY, a corporation,

*v.*

JOHN HANLON.

[Submitted June 22d, 1916. Decided December 16th, 1916.]

1. Under a contract of indemnity insurance the claim must be one reduced to certainty in amount. If the contract is ambiguous it should be construed more favorably to the defendant.

2. The amount of the claim in this case not being certain, the bill is prematurely filed.

---

On bill and answer.

*Mr. Arthur T. Dear,* for the complainant.

*Messrs. Benny & Cruden,* for the defendant.

GRIFFIN, V. C.

The complainant, by its bill, seeks to compel the defendant to convey certain lands to it under a supplemental indemnity agreement. The defendant, while admitting the agreement, says the contingency has not arisen which gives the complainant this right.

The case discloses that Lincoln-Steel-Fleming Company and Joseph A. Morrison, associated (hereinafter called the contractors), had a contract for the construction of certain sewers in district No. 9, town of Greenwich, Connecticut. The contractors, on July 8th, 1915, entered into a subcontract with Gibbons & Hanlon (hereinafter referred to as the subcontractors) for the rock excavation.

To indemnify the contractors, said subcontractors and the complainant gave a bond, dated July 8th, 1915, in the sum of $10,000 to the contractors. On July 7th, 1915, the subcontractors signed the usual printed application for the bond. On July 8th, 1915, John Hanlon, the defendant, one of the subcontractors, signed a memorandum addressed to the complainant as follows:

"I herewith agree, in consideration of the Maryland Casualty Company issuing bond on behalf of Gibbons & Hanlon, to give as further indemnity an assignment of all my right, title and interest in real estate situate 80 and 90 and 124 West Fifteenth street, Bayonne, and 124 West Fourteenth street, Bayonne, N. J., valued at $20,000, with mortgage of $6,000 thereon.

"Such assignment to be executed in event of claim under bond, and only for an amount equal to legal liability under the bond.

"No prior assignment of above has been or will be made."

The subcontractors proceeded with the work until about September 20th, 1915, upon which date the contractors gave to the subcontractors notice, under article 3 of the contract, that if they did not "proceed to supply sufficiency of properly-skilled workmen and materials and plant of the proper quality, and prose-

cute the work with promptness and diligence, and also settle up the debts already incurred by them" within three days after the receipt of said notice, it would take such action as might be necessary to protect their interests in the matter. This notice was served on the subcontractors and a copy sent to the complainant.

On September 29th, 1915, the contractors sent a long letter to the complainant charging non-performance by the subcontractors and asking complainant

"to live up to the conditions of your obligation and to at once proceed to carry out the terms and conditions of the contract, the performance of which you have guaranteed."

On October 2d, 1915, the contractor wrote the subcontractors terminating the employment of the subcontractors, stating that they would hold them and the bonding company liable for their loss and damage. A copy of this letter was also sent to complainant on the same day, which again called on complainant "to at once proceed to carry out the terms and conditions of the contract."

While the contractors allege non-performance of the contract, justifying the service of the notice, the subcontractors aver that while they were doing the work in accordance with the terms of the contract they were wrongfully prevented by the contractors from proceeding further.

In this situation the complainant, declining to carry out the contract on the subcontractors' account, it was undertaken by the contractors, who, on March 17th, 1916, rendered a bill to the complainant for $12,320.59. This sum is made up substantially of the difference between the alleged cost to the contractor of excavating the rock—about $6.90 a cubic yard—and the contract price, $2.75.

On October 15th, 1915, shortly after the contractor had determined that the subcontractors had abandoned their work, and before the claim of March 17th, 1916, had been served upon it, complainant filed its bill of complaint, praying (1) that complainant might have a lien upon the premises referred to in the supplemental agreement to secure it against losses incurred and

to be incurred under the bond; (2) that the defendant might be decreed to execute to complainant an assignment or other suitable evidence of the transfer of his title as security to the complainant against losses incurred and to be incurred; (3) that the further indemnity agreement be decreed to create and to have created and be established as creating and having created from its date a lien on the premises mentioned in the indemnity agreement, as collateral against the losses sustained and to be sustained by the complainant under the bond.

It may be said, in passing, that there is no proof of actual loss having been sustained by the complainant.

After the filing of the bill, and on January 5th, 1916, the contractor began suit in the supreme court in Putnam county, New York, against the complainant and the subcontractors on their bond, which suit is held in suspense pending the completion of the work and the ascertainment of the amount of the claim against the subcontractors.

The question whether the complainant is entitled to enforce the indemnity agreement at this time depends on the construction of the clause thereof, which reads as follows: "Such assignment to be executed only in event of claim under bond and for an amount equal to legal liability under the bond."

In seeking to interpret the language quoted resort has been had to the bond and application. This application is very lengthy, containing thirteen long, intricate covenants printed in small type; and was evidently drafted by the complainant to overcome the effect of decisions of the type of *Jeffers* v. *Johnson, 21 N. J. Law 73.* It sheds little light on the subject; and, as no extrinsic evidence has been offered, the contract must be construed, considering, first, the situation of the parties, and second, the purpose to be accomplished and when.

The complainant is a surety company engaged in business for profit; the defendant is a contractor whose firm required a bond to obtain a contract. The complainant desired indemnity; the defendant was willing to give it, not on the signing of the bond, but on the occurrence of some future condition. The indemnity agreement covers substantially all of the property of the defendant.

What did the parties intend when they used the language "such assignment is to be executed only in event of claim under bond, and only for an amount equal to legal liability under the bond?" The bond, which is on the printed blank prepared by the complainant, in the first condition, which deals with default on the part of the subcontractors and the liability of the surety company in case the contractor should complete or relet the contract, provides that

"all reserves, deferred payments and all other moneys provided in said contract which would have been paid to the principal had he completed the contract in accordance with its terms, shall be credited upon any claim the said obligee may make upon said surety."

The second condition provides "that no claim, suit or action by reason of any default shall be brought against the principal or surety after the 8th day of January, 1916," and also "that no judgment shall be rendered against the surety" (the complainant) "in excess of the penalty of this instrument"—the penalty being $10,000. The language "to be executed only in event of claim under bond," considered alone, is somewhat ambiguous. It might mean either when the claim is asserted or when established by judgment. Taken in the sense used in the first and second conditions of the bond, it may be construed to mean the actual money demand presented by the contractor to the complainant; because the first section provides that certain reserves, &c., should be credited upon any claim the said obligee might make upon the surety. This language imports the idea that the contractor should present his bill for damages and credit on account the reserves and deferred payments, leaving a balance for which it makes its claim upon the complainant. The claim so presented may be disputed, and may not ultimately be sustained for the amount claimed; and yet, in strictness, it may be treated as "a claim under the bond." But such interpretation does not aid the complainant, because no such claim was presented before the filing of the bill. But any ambiguity seems to be dispelled by the subsequent language, which deals with the amount for which the assignment should be given, viz., "only for an amount equal to legal liability under the bond." Clearly,

the parties did not intend, on the mere assertion of a claim, before the amount was ascertained, that this assignment should be made, or they would have stated the amount with definiteness, *e. g.,* as the penalty of the bond. It must, therefore, be quite apparent that the parties intended that "claim" in the agreement meant one reduced to certainty in amount, which, being ascertained, the right of the complainant to the assignment would automatically vest.

If the contract is ambiguous, it should be construed more favorably to the defendant.

The complainant is a surety company engaged in business for profit, in which the risks are carefully calculated, and the premium fixed at a figure to make the business commercially profitable; the bonds, applications and other instruments are carefully prepared by their counsel for their protection; for which reasons it has been held that if the instruments are susceptible of different meanings, that one should be adopted which is favorable to the other party. *American Surety Co.* v. *Pauly, 170 U. S. 133; Tebbets* v. *Mercantile Credit Co., 19 C. C. A. 281; 73 Fed. Rep. 95; Brandt S. & G. (3d ed.)* § 15.

To hold that on the mere assertion of a claim, however illfounded, the defendant became bound to assign practically all his property to the complainant as collateral to indemnify it against a loss it might never sustain, to ascertain which fact might take several years, and which would virtually take from the defendant the use and disposal of his property for business purposes, or otherwise, and might work an irreparable injury to him, requires that, considering the personality of the parties and the respective businesses in which they are engaged, the agreement should plainly express the intent now asserted by the complainant before it is entitled to relief.

The bill, having been prematurely filed, should be dismissed.