### HARE & CHASE, Inc., v. NATIONAL SURETY CO.

District Court, S. D. New York.
March 18, 1931.

Cabell, Ignatius & Lown, of New York City (Hartwell Cabell and Milton B. Ignatius, both of New York City, and Joseph S. Clark, Sr., and Joseph S. Clark, Jr., both of Philadelphia, Pa., of counsel), for plaintiff.

Lord, Day & Lord, of New York City (Henry De Forest Baldwin, George De Forest Lord, and Sherman Baldwin, all of New York City, of counsel), for defendant.

MACK, Circuit Judge.

After the defendant moved for the appointment of an auditor in an action at law by the successor in interest of Hare & Chase, Inc., the obligee of a bond against the obligor, plaintiff's motion for a transfer of the cause to the equity side of the court to determine several equitable issues raised by the amended answer was granted. Reformation of the bond because of alleged mutual mistake, and enjoining of the further prosecution of the action at law because of an alleged equitable estoppel, were thereby sought.

Plaintiff's assignor, Hare & Chase, Inc. (hereinafter referred to as plaintiff), an automobile finance company, had its principal place of business in Philadelphia, Pa.; defendant, a surety company, in New York.

In 1920, defendant issued a bond indemnifying plaintiff against ultimate loss resulting from defaults in the installment obligations acquired by it in the course of its business; this ultimate loss was the deficiency after resale of cars, plaintiff's security for the obligations.

On October 1, 1922, the 1920 bond was superseded by two bonds, one covering losses on wholesale business, the financing by plaintiff of a purchase of cars by dealers from manufacturers or distributors; the other covering losses on retail business, the discounting by plaintiff of paper given by retail buyers, of individual cars to the dealer seller. The latter notes were ordinarily without recourse on the dealer and were secured only by the car itself; in the wholesale transaction, the dealer was directly obligated on the notes discounted for the manufacturer or distributor.

All of these bonds covered paper acquired only from or through dealers whose names had been submitted to and approved by defendant; they recited that plaintiff would from time to time acquire automobile paper secured by "commercial or passenger vehicles, tractors or trailers." The wholesale 1922 bond stated that defendant's liability "shall be limited to the amount named in notice of acceptance." The 1922 bonds further limited the coverage to 70 per cent. of the wholesale and 75 per cent. of the retail purchase price of the car.

None of the bonds contained any reference to the computation or payment of the premiums other than the statement that defendant's obligation was in consideration of premiums computed at an agreed rate.

Each of the bonds bore an annotation "rate 1%," but, as to the 1922 bonds, that rate was afterwards reduced.

None of the bonds described the form or contents of reports to be rendered in respect of the business currently acquired or specified the time for premium payments. From 1920 on, however, reports were rendered monthly and the corresponding premiums remitted some weeks thereafter. The reports did not name the make of car, or indicate whether it was a passenger car, new or used, or some other motor vehicle. The last column of the form called for the amount of notes; the premiums were calculated on the amounts thereby reported.

Not all of plaintiff's business was entered in its contract register; such other dealings, including paper discounted for other finance companies, were not reported, and

no premiums were paid thereon. Alfred Hare, who was in charge of the business, believed that under each of the bonds he had the right to report only such of the business as he desired covered by the bonds. While the reports currently rendered have been referred to as "liability reports," they were useless as such, inasmuch as the outstanding liability could at no time be determined from them. They reflected only the new business acquired, without any indication of the business run off.

Early in 1923, so-called "deductibles" under the bonds were dealt with by successive collateral undertakings; these "deductibles" were the definite amount or a certain percentage of losses which plaintiff alone was to bear before defendant's obligation to reimburse should be enforceable.

No formal agreement was prepared to cover the last increase of the deductible; in the course of conferences it was suggested that the bond itself should be rewritten to include the deductible in order to avoid misapprehension as to the extent of the coverage by those who might see only the bonds and not the supplemental agreements.

After lengthy negotiations during 1924, the bond in suit covering retail and wholesale transactions, with a collateral premium agreement, was executed some time in January, 1925, effective as of January 1, 1925. This bond indemnified plaintiff against ultimate loss upon secured notes held by it above a minimum deductible loss of $600,000 for each period of six months; in other words, an initial loss to that amount for each such period was to be borne by the obligee itself; in other respects, it followed substantially the texts of the 1922 bonds.

The report under the 1925 bond for the month of January, 1925, was not forwarded until May 5th; it was accompanied by a request that plaintiff be advised whether the form was satisfactory. While the record discloses no reply thereto, this form was continued without objection during the life of the bond. The simplified report, merely listing the states from which business emanated, and specifying, as to each state, only the total wholesale and the total retail paper, was apparently adapted only to determine the amount of premiums due and to enable defendant to report to the several insurance departments the business transacted by it. It did not reflect the nature of plaintiff's current business, the makes of cars financed, or the dealers from whom paper was purchased. Such detailed information,

if required by defendant, could however have been obtained by inquiry of plaintiff or by examination of its records, in accordance with provisions of the bond.

1. *Reformation.* Because there is no provision in the bond expressly requiring plaintiff to render reports to the surety on newly acquired obligations, as an express condition precedent to coverage, the question of reformation is here presented, on defendant's contention that such a clause was omitted by mutual mistake.

Whether or not on a fair interpretation of the provisions of the bond as written and unreformed defendant is liable at law for losses on unreported transactions is not now before this court in this equity proceeding. The notes upon which loss was sustained and for which plaintiff claims indemnity under the bond were not reported to defendant in any form. Furthermore, premiums in respect thereto were never paid and were not tendered until after the losses in question had occurred and the controversy in respect to liability had arisen. The notes in question secured by 1,503 taxicabs, originally discounted by the General Finance Company of Indianapolis, were rediscounted by plaintiff for the latter company. They bore the full indorsement of the taxicab dealer that had made the sale, the Premier Motors, Inc. (manufacturers of the taxicabs), and the General Finance Company. Many of the sales involved were of fleets of taxicabs, as distinguished from the sale of an individual car to an individual purchaser.

The rediscounting by plaintiff was pursuant to a contract of March 31, 1924, by the terms of which plaintiff agreed to rediscount for the General Finance Company automobile paper up to $1,000,000. While, prior thereto, it had rediscounted such paper for other finance companies, such discounts were but rarely noted in its monthly reports to defendant.

Under the 1920 and 1922 bonds, monthly reports of the new paper acquired were sent to defendant, although, as heretofore stated, the bonds contained no express provision that made this necessary; defendant's approval of dealers alone was required thereunder. Premiums were paid on the basis of the reports. In addition to these so-called "liability reports," actual credit files of dealers whose paper was being discounted were sent to defendant until the 1925 bond became effective; thereafter, this procedure, not required by the bond, was discontinued.

While plaintiff continued to send defendant the monthly reports of new business, although in the greatly modified form above stated, during the effective period of the 1925 bond, no mention was ever made therein of the General Finance business and no premiums were paid thereon. When this business began under the contract of March, 1924, the General Finance Company was engaged almost exclusively in financing Ford car sales. In June, 1924, however, plaintiff began to rediscount fleet taxicab paper for the General Finance Company; the latter was only then entering upon this new field of activities. From June 20, 1924 to January 1, 1925, $1,300,796.50 of this paper was thus rediscounted.

The negotiations between plaintiff and defendant for the 1925 bond were begun in the spring of 1924 and consummated in January, 1925. This period of negotiation, therefore, overlaps plaintiff's discounting of the General Finance Company taxicab paper. The principal actors in the negotiations were Rathbone, defendant's vice chairman, the Hare brothers, and Watkins, a so-called "special agent" of defendant. It is largely to the testimony and correspondence of these men that we must look for the facts.

The main reasons for redrafting the 1922 bond were Rathbone's desire to increase the deductible initial loss to be borne by the obligee, to $600,000, and Alfred Hare's desire for a reduction in the premium rate. These inter-related matters were the focal points of the discussions which began in the spring of 1924. A supplemental issue was raised by Hare with respect to the reports. At that time, under the 1922 bond, they were bulky and, for plaintiff, expensive. Rathbone agreed, at least tentatively, to a change in their form. Immediately after a conference on December 5, 1924, between Rathbone and the Hare brothers, Rathbone dictated the following memorandum to Simpson, manager of his guaranteed note department:

"In discussing the Hare & Chase bond today with broker Watkins and both of the Mr. Hares, a suggestion was made that in view of the large deductible, we could waive the reports that they are now sending in or very much modify them.

"I tentatively agreed to a monthly report that will give the number of cars covered, the amount of the paper in dollars, the amount of the ultimate loss sustained, and the amount of salvage collected—all to be reported by states. Do you see any objection to this plan?"

The questions to be decided in this proceeding for reformation of the bond go be-

yond this "tentative" agreement. Did the parties reach a definite and complete agreement as to points apparently not expressed in the bond? If so, did they intend to include it in the written terms of the bond, or were they content to leave it as a collateral agreement? And if an agreement to report all business was to be so included, was it to be expressed as a condition precedent to liability?

The general principles as to reformation are simple; their application to a particular situation is often troublesome. Written agreements are reformed only upon the clearest evidence of fraud or mutual mistake. A mere preponderance of the evidence will not suffice. Philippine Sugar Co. v. Government of Phillipine Islands, 247 U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177; Skelton v. Federal Surety Co. (C. C. A.) 15 F.(2d) 756; Bailey v. Lisle Mfg. Co. (C. C. A.) 238 F. 257; Snell v. Ins. Co., 98 U. S. 85, 25 L. Ed. 52. In my opinion, the evidence adduced by defendant falls short of the degree of proof required. It has failed clearly to establish the actual terms of the agreement which it now seeks to have this court incorporate into the bond as written. There is no such proof of an agreement made before the execution of the bond, certain in its terms, for periodic reports. At best a mode of reporting was agreed to "tentatively" by Rathbone. This so-called agreement between Hare and Rathbone, even if it be construed as final in its details, may have been merely a routine matter, not directly connected with the bond itself. That is the tenor of the testimony of Alfred Hare. It has certainly not been satisfactorily established that both parties intended it to be a condition precedent to coverage, or that any such intention was communicated by either to the other party or to any one else at the time. True it is that Alfred Hare himself seemed to be under the impression, as well during the time that the earlier bonds were in force as during the period of the 1925 bond, that unreported paper was not and was not intended to be covered, and that no premium thereon was to be paid. On a proper interpretation of the bond, it may be found that in this respect he erred. I express no opinion thereon, for we are here dealing, not with the construction of the bond itself, but with its reformation. The state of mind of Hare alone, regardless of whether or not he erred, casts no light upon the state of mind, the intent of Rathbone. A mistake to be ground for reformation must be mutual. If, under the bond as

written, unreported business was covered, Hare's belief and intention, if not shared by Rathbone, that only reported business should be covered, would not bar an action by defendant to recover unpaid premiums on unreported business. In the present equity proceeding, on the issue of reformation, I must assume, hypothetically, that the bond covers unreported business; on any other hypothesis, the prayer for reformation would be futile. The question then is, Did defendant, through Rathbone, share Hare's intent that the bond should cover only reported business? The reports, although referred to as "liability reports," did not indicate the outstanding liability of the surety under the bond at any given time. Only new business was reported as it came in to plaintiff monthly; no reports were made of retired obligations. The only method by which the surety could gauge its outstanding liability was by an inspection of the books of Hare & Chase, which contained a record of paid off obligations. The reports themselves, in the modified form accepted under the 1925 bond, showed merely the number of cars covered, the amount of paper, the amount of ultimate loss, and the amount of salvage collected—reported by states. Neither the names of the dealers nor the makes of cars were stated. In the absence of proof to the contrary, it is fair to interpret the purpose of these reports as that for which alone they appear useful, to compute premiums and to render accurate reports to insurance commissioners of the states in which defendant engaged in business. The reports, therefore, do not justify the conclusion that defendant intended to cover only reported business.

But if it were otherwise, defendant would have another difficulty; it has certainly failed to establish any clear intention to have reduced to writing and incorporated into the bond the alleged agreement to limit the coverage to reported business. In his memorandum of December 5, 1924 to the manager of his guaranteed note department, Rathbone notes that he "tentatively agreed" to a new form of reports, but says nothing about putting this into the bond; furthermore, it does not appear that he wrote any similar memorandum to Whitlow or Garner, who drew the bond. Their testimony tends also to cast light on defendant's attitude toward inclusion of such a provision into the bond. Whitlow testified as follows:

"Q. Did Mr. Hare ever object to including this provision for liability reports in the bonds? There was no objection? A. That

question was never raised in my presence." Garner, defendant's attorney, testified as follows:

"Q. Did you know Mr. Rathbone's agreement with Mr. Hare as to these monthly liability reports? A. I never heard of that agreement until after this claim was made.

"Q. Did you notice that there was no provision in the bond as drafted, with respect to periodic liability reports? A. I did not, and my attention was not directed to it; that was not one of the things taken up for my consideration."

If there was any intention on defendant's part, through Rathbone, actually to include the provision for periodic reports in the bond as a condition precedent, it is difficult to believe that he would have neglected to state this either to the Hares or to the men who were drafting the bond.

■ Cases holding that an inadvertent omission by a scrivener from the written contract of an agreement arrived at in preliminary negotiations is a ground for reformation are therefore inapplicable. Nor are the cases that a mistake of law, as well as a mistake of fact, will support a decree of reformation, of any greater applicability. See Philippine Co. v. Government of Philippine Islands, 247. U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177; Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 999, 35 L. Ed. 678; Snell v. Ins. Co., 98 U. S. 85, 25 L. Ed. 52; Skelton v. Federal Surety Co. (C. C. A.) 15 F.(2d) 756; Clarksburg Trust Co. v. Commercial Casualty Co. (C. C. A.) 40 F.(2d) 626. I say this because I am not convinced that there was a mutual misconstruction of the bond, if misconstruction it be. A mere mistake of law by one party lacking the consensuality of an objective expression by both parties is, of course, no ground for reformation. If it were, all contracts would be subject to nullification at the suit of the party who could best plead carelessness or ignorance.

Defendant in support of its claim for reformation cites Murray v. Dake, 46 Cal. 644; Maher v. Hibernia Insurance Co., 67 N. Y. 283, as holding that an oral agreement or provision, though unenforceable in its inception, may, by the subsequent conduct of the parties, become binding.

In Murray v. Dake, defendant was led to omit a provision of the lease which he would have inserted had it not been for the assurances of plaintiff that it was not necessary to insert it. Here, however, we have no such situation. Rathbone never suggested to Hare the inclusion of a clause making reporting a condition precedent to coverage, and Hare, therefore, never had occasion to counter with the suggestion that such a clause was unnecessary.

In Maher v. Hibernia Insurance Co., plaintiff had returned a fire insurance policy to the defendant's agent requesting that the phrase "occupied as a dwelling" be changed to state the fact that a grocery store was kept in the building. Defendant's agent declined to correct it, expressly stating that the policy as written covered the store. Plaintiff further proved that, after the policy was issued, defendant's secretary and general agent, after having seen the policy, examined the building. The question was as to the admissibility of parol evidence to this effect. The Court of Appeals held there was no error in its admission. In that case, as in the Murray Case, there was a reliance by the party seeking reformation on an active representation of the other party, which created a sense of security in the language as written.

I find, therefore, that defendant has failed to establish by that high degree of proof required the facts necessary to support a decree of reformation.

■ 2. *Equitable estoppel.* Plaintiff's conduct upon which defendant bases this claim may be divided into two parts: (a) The representations or concealments prior to the execution of the bond in suit and (b) the failure, after the execution of the bond, to report the facts in reference to the General Finance Company's rediscounted paper, including the method of refinancing it. I am satisfied upon reconsideration that the plaintiff did not waive its right to have the issues raised by these latter matters tried before a jury. Liberty Oil Co. v. Condon Bank, 260 U. S. 235, 43 S. Ct. 118, 67 L. Ed. 232, prescribes the proper procedure for the trial of equitable issues in a law case; it does not purport to extend the scope of the equity jurisdiction to curtail the right of trial by jury. Liberty Oil Co. v. Condon Bank, at page 243 of 260 U. S., 43 S. Ct. 118. The propriety of plaintiff's methods in dealing with the rediscounted paper when it became overdue is a subject of legal defence, and, in the absence of a waiver, is not to be dealt with in equity. The determination of the issue of misrepresentation or concealment prior to the completion of the bond and its effect as an estoppel is here by plaintiff's consent; it moved for a transfer to the equity side after the defendant's answer had been amended to ask the relief now prayed.

It admitted that its objection to the determination in equity went solely to events subsequent to the completion of the contract. Although an estoppel in pais is cognizable as a defence at law [See Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618; Weber v. Hertzell, 230 F. 965 (C. C. A. 8th)], plaintiff's motion and its consent to have the issue tried in equity is a waiver of its right to a jury trial thereon.

As to the negotiations prior to the execution of the bond, defendant's position is that it relied upon a continuance of the general character of plaintiff's business which was, so far as it was concerned, the discounting of pleasure car paper. The financing of taxicabs, in particular, and the rediscounting of paper previously discounted, in general, constituted, it claims, a material deviation from plaintiff's prior business which had been represented by plaintiff to defendant, either affirmatively or by its silence, as the type of financing to be covered, under the 1925 bond. The evidence, in my judgment, supports defendant's position. That defendant was interested in the details of plaintiff's business is strikingly apparent from the testimony. Nor can one escape the conclusion that Hare's information given to the defendant's officials was on the basis of an apparently full disclosure. The parties were negotiating the 1925 bond with the background of their mutual experience under the earlier bonds. If Alfred Hare's recollection that the type of financing engaged in by his company was not discussed at any time subsequent to June, 1924, is correct, it is clear that Rathbone must have assumed a continuance of earlier conditions (and by his silence Hare affirmed this belief), or Rathbone would have engaged in the same sort of inquiry which he seems to have made in the earlier negotiations. Prior to the writing of the former bonds, as well as during their term, Rathbone and the Hares discussed the type of financing done; Hare explained in detail the makes of cars his company accepted and his reasons for refusing others. In at least one of his annual reports, as president of Hare & Chase, to the stockholders, of which Hare sent a copy to the defendant, he listed by name the makes of cars financed. From correspondence introduced in evidence, it appears also that Hare apprised defendant of the success of his business, always stressing its conservative character. The method of doing business was gone over in discussions between the Hares and Rathbone; when the Hare & Chase branches were to become sep-

arate corporations early in 1925, it was made known to Rathbone. He recognized it, as he said, as a mere change in form from the old way of doing business. Discussion was had specifically about the taxicab business. Rathbone told Hare he did not like taxicab paper and did not care to have it on his books; Hare agreed and said he, too, was unfavorable to taxicab paper. Emlen Hare testified that at every meeting "* * * the safety of our proposition and the type of stuff we financed was discussed. * * *" Certain taxicab business had been reported to defendant prior to the 1925 bond, but this did not include fleets; and such taxicab financing as was done appears to have been hedged about with such special safeguards as a requirement of weekly instead of monthly payments. That Alfred Hare recognized the difference in the class of business between pleasure car and taxicab fleet financing is shown by his early unwillingness to take the General Finance Company taxicab paper and by his insistence that the safety of the Hare & Chase proposition lay in its reliance upon the car itself rather than upon the dealer. He recognized that in the case of taxicabs the car itself had little resale value, and that the only possibility of getting any salvage on taking possession was in its actual operation. The credit application which Hare & Chase required retail purchasers to fill in included a question as to whether the vehicle was to be used to carry passengers for a consideration, thus indicating again a distinction in the mind of plaintiff's officers as to the type of risk. The subsequent course of conduct when the taxicab paper became overdue shows the difference in risk involved. Alfred Hare justified the refinancing of the taxicabs by plaintiff, including reconditioning of the cabs and their operation by subsidiaries of the General Finance Company as the only possible way to save the situation, inasmuch, as when repossessed, the resale on the open market of taxicab fleets was admittedly impossible.

■■■ A bond that guarantees against losses is construed as a policy of insurance. American Credit Co. v. Athens (C. C. A.) 92 F. 581; Tebbets v. Mercantile Credit Co. (C. C. A.) 73 F. 95, 97; Shakman v. U. S. Credit System Co., 92 Wis. 366, 66 N. W. 528, 32 L. R. A. 383, 53 Am. St. Rep. 920; Claflin v. U. S. Credit System, 165 Mass. 501, 43 N. E. 293, 52 Am. St. Rep. 528; Joyce, Insurance (1917) § 339h; 1 Cooley, Briefs on Insurance, 122. The rule of strictissimi juris is therefore inapplicable, and

the rights of the parties must be governed by analogy to the law in respect to other forms of insurance contracts. See 2 Cooley, supra, 988.

Defendant, in its pleadings, alleges both misrepresentation and concealment. General statements in evidence may well lead to the inference that, during negotiations preliminary to the earlier bonds, the Hares affirmatively stated their policy of refraining from the assumption of fleet taxicab risks. At that time, this was, apparently, true. On this record I must, however, hold that, during the course of the negotiations which directly led to the bond in suit, no active misrepresentations were made by plaintiff that they did not accept fleet taxicab risks. But even if there were affirmative representations in the early part of these negotiations, defendant's contention that a failure to disclose the material change after June, 1924, evidenced by the taking of taxicab paper under the General Finance Company contract of March, 1924, brings the case within the rule that such a change creates a duty of disclosure, is untenable. The cases imposing a duty to disclose changes in material elements of the risk, occurring between the time of the application and the issuance of the policy, are predicated upon the applicant's fraudulent intent. Stipcich v. Metropolitan Life Ins. Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895; Piedmont Life Ins. Co. v. Ewing, 92 U. S. 377, 23 L. Ed. 610; Equitable Life Assurance Co. v. McElroy (C. C. A.) 83 F. 631; Cable v. United States Life Ins. Co. (C. C. A.) 111 F. 19, reversed on other grounds 191 U. S. 288, 24 S. Ct. 74, 48 L. Ed. 188; Harris v. Security, etc., Ins. Co., 130 Tenn. 325, 170 S. W. 474, L. R. A. 1915C, 153, Ann. Cas. 1916B, 380; Cummings v. Connecticut General Life Ins. Co., 101 Vt. 73, 142 A. 82.[1]

No proof of such fraudulent intent was made in the present case. In view of Hare's belief that the taxicab paper was not covered by the bond, his failure to disclose the taking of taxicab paper under the General Finance contract cannot be attributable to any fraudulent motive. The defense, therefore, based upon plaintiff's conduct before the execution of the bond must be that of intentional nondisclosure of material facts, and not of active misrepresentation or fraudulent concealment of such facts.

Logically, the distinction between an erroneous negative reply to an inquiry as to the taking of taxicab paper and an intentional but nonfraudulent failure to disclose the existence of such a practice, where no specific inquiry is made, is slight. See Weigle v. Cascade Fire Ins. Co. (1895) 12 Wash. 449, 452, 41 P. 53.

Yet for practical reasons the distinction between such a misrepresentation, and such a nondisclosure or concealment may be important. The emphasis in the law of insurance, in this respect, rests largely upon a recognition of the usual relative inequality in knowledge and skill between the insurer and the insured. The ordinary applicant for insurance cannot be expected to know what are all the factors material to the risk; on the other hand, the insurer, generally, can adequately protect itself in covering in specific questions a wide range of subject-matter. The reluctance of the courts, in recent years, to aid the unwary insurer at the expense of the insured who in good faith has failed to disclose a material fact, and the resulting practice of insurers to require answers to specific questions, make the case of innocent nondisclosure by the insured comparatively rare in these days. Some reference must, therefore, be had to the cases of innocent misrepresentation. 3 Joyce, Insurance (1918) § 1844. The rule may be taken to be fairly established, although not without exceptions, that, where the insurer is induced to enter into the contract by a representation as to a material fact, the policy will be avoided, whether the misrepresentation was made willfully with intent to deceive, or through innocent mistake. 3 Cooley, Briefs on Insurance (1927) 1911; 3 Joyce, Insurance (1918) § 1902, collecting cases.

It is earnestly contended that the modern rule as to nondisclosure, however, relaxes the rigor of the strict doctrines of marine insurance to the extent that a failure to disclose a material fact does not afford the insurer a defense unless a fraudulent intention on the part of the insured is proved. See cases in 3 Joyce, p. 2985, note 20. The validity of this generalization must be tested in the light of the rationale of the cases which support it and its applicability here.

---

[1] Although Gordon v. Prudential Insurance Co., 231 Pa. 404, 80 A. 882, suggests that the "good faith of the insured is immaterial where a material change has taken place," the facts indicate that the applicant there must have known that he was seriously ill. Moreover, as was said in the Cummings Case, supra: "No question of good faith arose in the case. The question was merely whether the contract of insurance had become effective, and, since the premium was not paid during the good health of the insured, as provided by the receipt, the policy did not become binding." 101 Vt. 73, 142 A. 82, at page 89.

on a careful analysis of the facts of the present controversy.

■ Admittedly, we are not dealing with a case of actual fraud; but, on the other hand, it is neither a case of ignorance of the materiality of the facts, nor of forgetfulness to disclose them. Hare well knew the materiality to the insurer of full knowledge of the General Finance Company business in determining whether it would accept this risk of taxicab fleet losses, and, if it did so, then in fixing the minimum deductible loss to be required and the premium to be paid. His failure to disclose the facts was within the bounds of good faith solely because of his belief that Hare & Chase were not to be and were not covered as to unreported General Finance Company paper. The nondisclosure is unique in this, that, though the material fact was concealed intentionally, the concealment was not fraudulent.[2] The question, therefore, is this: If the insured intentionally fails to disclose material facts because of his belief that the insurance is not to cover the undisclosed risk, and pays no premium for such risk, is he estopped to establish a claim in respect to such a risk?

An analysis of the cases which on the ground of the insured's good faith abate the rigor of the marine insurance rule of full disclosure demonstrates that in those cases the insured honestly believed himself within the coverage of the policy. In those circumstances, on a balancing of the interests involved, the insured's good faith and honest reliance upon the validity of his policy, as against the insurer's ability to eliminate the possibility of mistake by opportunely focusing attention upon the material matter, very properly led to a denial of the defense. But when, as here, the insured, instead of relying upon any supposed protection under the policy, fails to make disclosures which it knows would be material because it believes itself in no event covered as to certain risks, the balancing of interests should inure to the benefit of the insurer. It has not been afforded the essential information for a decision as to its willingness to cover the risk; the insured, on the other hand, has in no sense been lulled into security by any assumption that the policy has granted protection.

A second important ground of distinction between the instant case and the ordinary case of life, fire, or credit insurance, is

illustrated by the informal nature of the negotiations. In the standard forms of insurance, the material elements of the risk have been included within standardized applications. This practice serves by exclusion to narrow the field of material facts. See Williston, Contracts § 1499, note 81; Phoenix Mut. Life Ins. Co. v. Raddin, 120 U. S. 183, 7 S. Ct. 500, 30 L. Ed. 644; Keatley v. Grand Fraternity (D. C.) 198 F. 264; See 3 Joyce, Insurance (1917) §§ 1844, 1914. A matter which is not made the subject-matter of inquiry is deemed immaterial. In substance, there is a waiver. See Elliott, Insurance § 91. In the instant case, there was no application blank; in view of the subject matter of the contemplated insurance, there were not and there could not well have been any standardized questions. This contract of insurance could have been and was made only after negotiations and these between business men on an equal footing.

There was no such inequality in experience between insurer and insured as is usual in insurance contracts. Cf. Taft, J., in Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank (C. C. A.) 72 F. 413, 38 L. R. A. 33. Hare was an expert insurance man; the bond and collateral agreements were modified at his suggestion, and his criticism of their terminology was invited. There were proposals and counter proposals. The discussions were had on the basis of an apparently full disclosure upon which defendant properly relied. There is no basis therein for any analogy to a waiver by defendant of a disclosure of facts material to the risk.

After repeated consideration of the evidence and arguments, I am satisfied that the relief must be granted to defendant. The most exhaustively reasoned case ostensibly supporting the generalization contended for by plaintiff is Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank (C. C. A.) 72 F. 413, 38 L. R. A. 33. But none of the grounds of distinction there relied upon seem apposite in the present case. (1) In marine insurance, the ship is often not subject to inspection by the insurer. See Ranney, J., in Hartford Protection Ins. Co. v. Harmer, 2 Ohio St. 452, 59 Am. Dec. 684. True, defendant might have demanded such an audit of the applicant's books as would have revealed the nuances of the financing theretofore engaged in by plaintiff. But in the light of its past continuous dealings with plaintiff, there was, in my judgment, no occasion for such a demand. It is, therefore, unlike an inspection of premises for fire or medical ex-

[2] Cf. 3 Joyce, Ins., § 1847. "If the act of the insured in withholding a material fact or circumstance is intentional or designed, then it will be an actual fraud necessarily avoiding contract."

amination for life insurance. (2) That an applicant for life or fire insurance "is not required to rack his brain or memory for circumstances of possible materiality, not inquired about and to volunteer them," in view of the many questions specifically asked of him, offers no analogy to the instant case, for the reasons heretofore stated. (3) The inability of the insured, because of his death at the time when litigation would usually occur, to explain his failure to disclose, is ordinarily applicable only in life insurance cases. (4) While failure to disclose a clearly material fact is ordinarily tantamount to fraud, the instant case demonstrates that the insurer would not be properly protected if actual fraud were the only basis for such a defense. (5) The officers of a finance corporation applying for indemnity insurance like applicants for marine insurance, but, in this respect, unlike applicants for life insurance, understand the usages of the business and the need of full disclosure as a basis for assuming the risk.

The recent case of General Reinsurance Corp. v. Southern Surety Co. (C. C. A.) 27 F.(2d) 265, adds nothing to the general doctrine urged by plaintiff. There the insured honestly deemed itself within the coverage of the reinsurance contract; it was moreover found to be ignorant of the material fact which it failed to disclose. Indeed, some of the language of the court seems to support the defendant's contention. At page 273 of 27 F.(2d), it is said that the insurer has a defense (1) where insured, having actual knowledge of material facts, has intentionally failed to disclose them truthfully; (2) where insured, though not having actual knowledge of material facts, yet has intentionally, and in bad faith, refused to become acquainted with the facts.

It is to be noted that in (1) intentional nondisclosure is specified without, as in (2), the addition of bad faith.

The bond in suit is a Pennsylvania contract. The obligations of the contract are referable to the law of that jurisdiction, for the last act requisite to the consummation of the agreement, the signing by Hare & Chase of the collateral agreement and its deposit in the mails, occurred in Pennsylvania. The validity of such defenses to the contract as are here interposed are determined by reference to the law of the place of contracting. American Law Institute, Restatement of the Conflict of Laws. Tentative Draft No. 4, §§ 357, 369. Logically, even if the defense does not contemplate a complete avoidance of the whole contract, but merely aims to limit the zone of its application, the law of the jurisdiction by which the obligation of the contract itself is determined should control.

There seems to be no Pennsylvania case directly in point. It was held in an early case that, even innocent concealment gives a defense to the insurer. Smith v. Ins. Co. (1851) 17 Pa. 253, 55 Am. Dec. 546. Gibson, J., said (at page 261 of 17 Pa.) : "It is not sufficient for the insured to answer all the questions propounded to him. Like a witness on the stand, he is bound to tell the whole truth without waiting to be interrogated." In that case, plaintiff, a mortgagee insured against fire loss, had disclosed only one of several mortgages held by him. When the loss occurred, the insurer expressed its willingness to settle for that portion of the risk covered by the mortgage disclosed, or for the entire risk if the plaintiff would permit it to be subrogated to his rights under the undisclosed mortgages as well. Although there was no proof of actual fraud, the court held for the defendant.

The rule, as broadly laid down in the Smith Case, is probably no longer the law in Pennsylvania. The Penn Mutual Case, supra, involved a Pennsylvania contract of life insurance. While the Smith Case does not appear to have been there considered, its broader implications seem to have been supplanted by a view more favorable to the insured, at least in life insurance. It has accordingly been held in Pennsylvania that, where statements in a life insurance application are to be considered as representations and not as warranties, misstatements, even though material, will not forfeit the policy, if made in good faith. Kuhns et al. v. N. Y. Life Ins. Co. (1929) 297 Pa. 418, 147 A. 76, and cases cited. Cf. Keatley v. Grand Fraternity (D. C.) 198 F. 264; Id. (D. C.) 198 F. 272. The law of fire insurance seems to be the same. Imperial Fire Ins. Co. v. Murray (1873) 73 Pa. 13. It may, accordingly, be taken as established doctrine in Pennsylvania that the strict rules of marine insurance have been relaxed in life and fire insurance. But no Pennsylvania authority has been cited or found in which the insured did not believe himself covered by the policy as to the misrepresented or concealed matter.

In the absence of a warranty, undisclosed matter must in any event be material to render its nondisclosure significant. The test of the materiality of a fact was stated by Story, J., to depend upon whether it would

have influenced the underwriter "either not to underwrite at all, or not to underwrite, except at a higher premium." Columbian Ins. Co. v. Lawrence, 10 Pet. 507, 516, 9 L. Ed. 512. The more recent cases are in accord with this formulation. McCaffrey v. Knights of Columbia, 213 Pa. 609, 612, 63 A. 189; Young v. American Bonding Co., 228 Pa. 373, 380, 77 A. 263; Miller v. Maryland Casualty Co., 193 F. 343 (C. C. A. 3d); Davis-Scofield Co. v. Agricultural Ins. Co., 109 Conn. 673, 145 A. 38, 40.

In life insurance, the weight of particular elements of a risk is ordinarily determinable by reference to the relation of that element to the average mortality. In fire insurance, the more common increases in hazard are also clearly discernible as material. In the type of guaranty insurance here involved, the tests of materiality are not so simple. There is no actuarial table to which reference may be had as a basis for judgment. The field is one in which the risks are speculative and largely individual. The premium rate is arrived at, at least partially, as in this case, by a process of trial and error by the insurance company, and by bargaining limited by competition. The ultimate decision in each case both as to assumption of the risk and as to the premium rate must be based upon a business judgment in the light of all relevant and material facts. Applying the test of Story, J., I find the concealment clearly material in the present case. I have hereinabove referred to the discussions between Rathbone and the Hares as to taxicab paper, and to Hare's own views on the subject. Whether defendant actually would have refused the risk if it had been presented cannot of course be positively known. Although plaintiff, prior to the final negotiations of December, 1924, had discounted fleet taxicab paper for the General Finance Company (to the amount of $1,200,-796.50 from June, 1924, to Jan. 1, 1925, of which $1,048,894.50 was outstanding on the latter date), nothing of this was disclosed to defendant, which was entitled to exercise its own independent judgment as to whether or not it would take a risk of this kind. The lack of diversity in this financing of fleet taxicab paper, coupled with the difficulty of realization of cash upon resale in the open market, makes the risk different in kind from the regular branch discounting of pleasure cars engaged in by plaintiff. Plaintiff's ultimate willingness to take the risk of discounting notes based upon such transactions cannot of course limit the defendant insurer's independent exercise of judgment thereon.

Plaintiff invokes the rule of mutuality of estoppels. Accepting, for the purposes of this equity hearing, plaintiff's construction of the bond as written and unreformed, to cover automatically unreported business, I agree that defendant would have an absolute right to recover the premiums on such business. Plaintiff argues that, if defendant had discovered the facts and the disaster had not come, defendant would therefore never have sought a reformation of the bond or asserted an estoppel as against plaintiff, and in any event plaintiff would have been in no position to estop defendant from asserting successfully such a claim. Thus mutuality of estoppel fails.

This contention is based upon a misconception of the application of the mutuality rule. An estoppel arising out of the misconduct of one party is in its very nature unilateral; by reason of the misconduct, that party is estopped. Bigelow Law of Estoppel (1913) 710; Ewart Estoppel By Misrepresentation (1900) 198. If his opponent takes advantage of that estoppel, he cannot thereafter make claims inconsistent therewith. In that sense, but only in that sense, is there a requirement of mutuality in respect to such an estoppel. As applied to the present case, defendant could not on the one hand, defeat plaintiff's claim by the estoppel, and, on the other hand, assert at the same time a right under the bond as written to premiums on the unreported business.

Much evidence has been introduced regarding the status of Watkins who was instrumental in bringing the contracting parties together, and the matter has been fully argued. Plaintiff contends that Watkins, as defendant's agent, obtained knowledge of the General Finance Company proposition during the course of his employment, and that such knowledge binds the defendant. As there is no claim that notice was given by plaintiff to Watkins as such agent for transmission to the defendant, we are concerned only with the actual scope of Watkins' authority, and not with any reliance upon an apparent authority. American Law Institute, Restatement of the Law of Agency, § 498, and comment. Concededly he had no power to complete contracts or to determine the acceptability of risks. His function was that of solicitation and introduction. He received requests from Hare which he passed on to an official of defendant. At times they were granted; at other times, not. When he had gotten a responsible official to

"take up the matter," his duties and powers were ended. In view of this position of Watkins, affected as it was with no semblance of responsibility, it is clear that his status was at best merely that of a soliciting agent.

The evidence divides itself into two parts: Alleged knowledge acquired by Watkins on or before January 2, 1925, that plaintiff rediscounted taxicab fleet paper, and alleged knowledge acquired by him some months later, through contacts with Dixon of the Premier Cab Company, an organization whose notes the General Finance Company was discounting, and with Githens of the latter company.

■ Notice or knowledge communicated to a soliciting agent subsequent to the binding date of the contract does not affect the insurer. Ætna Fire Ins. Co. v. Kennedy, 161 Ala. 600, 50 So. 73, 135 Am. St. Rep. 160; Taylor v. State Ins. Co., 98 Iowa, 521, 67 N. W. 577, 60 Am. St. Rep. 210; Cobel v. Hartford Ins. Co., 154 Minn. 233, 191 N. W. 592; Kring v. Globe, etc., Ins. Co., 195 Mo. App. 133, 189 S. W. 628. See Wood v. American Fire Ins. Co., 149 N. Y. 382, 44 N. E. 80, 52 Am. St. Rep. 733; Lewis v. Guardian Fire Ins. Co., 181 N. Y. 392, 74 N. E. 224, 106 Am. St. Rep. 557; Moller v. Niagara Fire Ins. Co., 54 Wash. 439, 103 P. 449, 24 L. R. A. (N. S.) 807, 132 Am. St. Rep. 1115; 5 Cooley, Briefs on Insurance, 4053.

The policy in suit was completed some time during the month of January, 1925. It is clear, therefore, that any facts which may have been disclosed to Watkins subsequent to the completion of the contract in January, 1925, could not be imputed to the knowledge of the defendant.

We are remitted, therefore, to the evidence of Watkins' knowledge of January 2, 1925. Alfred Hare was vague in his recollections. He could not remember as to how much of the details of the General Finance business he had informed Watkins, but he thought that he must have told Watkins of the general relations of the plaintiff with the General Finance Company. He did not recall specific conversations. The other testimony as to Watkins' knowledge during the period under consideration related to a chance meeting of Watkins with Githens and Dixon on January 2, 1925, through the medium of Alfred Hare. Dixon testified that Hare introduced him to Watkins as "the man that builds these cabs we have started to take paper on." The evidence does not indicate that the General Finance business was then discussed in the presence of Watkins. Githens does not testify to anything similar being said in his introduction to Watkins. Watkins specifically denies the testimony of Dixon.

■ On the whole, I am convinced that the testimony is too weak to support a finding that Watkins, at that time, knew of the rediscounting relation between the General Finance Company and the plaintiff. Knowledge of an agent, even of a general agent, to be imputed to his principal, must be actual knowledge. Williams v. Atlas Assurance Co., 22 Ga. App. 661, 97 S. E. 91; Hughes v. Metropolitan Ins. Co., 117 Me. 244, 103 A. 465 (strictly construing a statute making knowledge of an agent that of the insurance company). See Lorie v. Connecticut Mutual Life, 15 Fed. Cas. page 891, 892, No. 8509. Mere conjecture based upon vague recollection which gives not a semblance of detail is not sufficient. Assuming, therefore, contrary to defendant's insistent argument, that Watkins was defendant's agent and not a mere broker, plaintiff nevertheless cannot recover, because of a failure to prove Watkins' actual knowledge of the essential facts.

In view of this result, it is unnecessary to discuss the testimony relating to payments made by both parties to Watkins or to decide his exact position, whether it was that of a broker, or defendant's special agent, or plaintiff's agent.

Under the foregoing analysis, it is unnecessary too to consider the testimony introduced to show the refinancing operations engaged in by plaintiff after the original taxicab paper had matured.

Since the issue of the effect of nondisclosure prior to the completion of the contract is before me on the equity side of the court by plaintiff's consent, the case will be determined on the merits. An injunction will issue restraining the action at law against defendant upon any claims arising out of losses on unreported rediscounted taxicab paper of the General Finance Company or on the refinanced notes of its subsidiaries.